Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
12/15/2020 08:08 AM CST

MICHELLE M. CHMELKA, APPELLANT,
v. KYLE L. CHMELKA, APPELLEE.
___ N.W.2d ___

Filed December 8, 2020.    No. A-20-043.

1. **Divorce: Child Custody: Child Support: Property Division: Alimony: Attorney Fees: Appeal and Error.** In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees.

2. **Evidence: Appeal and Error.** In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue. However, when the evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another.

3. **Judges: Words and Phrases.** A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.

4. **Appeal and Error.** To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error.

5. **Trial: Evidence.** Evidence not directly contradicted is not necessarily binding on the triers of fact, and may be given no weight where it is inherently improbable, unreasonable, self-contradictory, or inconsistent with facts or circumstances in evidence.

6. **Child Custody.** Joint physical custody is neither favored nor disfavored under Nebraska law, and, in fact, no custody or parenting time arrangement is either favored or disfavored as a matter of law.

7. ____. In addition to the "best interests" factors listed in Neb. Rev. Stat. § 43-2923 (Reissue 2016), a court making a child custody determination may consider matters such as the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy the educational needs of the child.

8. **Divorce: Property Division.** In a divorce action, the purpose of a property division is to distribute the marital assets equitably between the parties.

9. **Property Division.** The first step in property division is to classify the parties' property as marital or nonmarital.

10. **Divorce: Property Division.** The marital estate does not include property that a spouse acquired before the marriage, or by gift or inheritance.

11. ____: ____. Separate property becomes marital property by commingling if it is inextricably mixed with marital property or with the separate property of the other spouse. If the separate property remains segregated or is traceable into its product, commingling does not occur.

12. **Divorce: Property Division: Proof.** The burden of proof rests with the party claiming that property is nonmarital.

Appeal from the District Court for Saunders County: Christina M. Marroquin, Judge. Affirmed.

John H. Sohl for appellant.

Amie C. Martinez and Megan M. Zobel, of Anderson, Creager & Wittstruck, P.C., L.L.O., for appellee.

Pirtle, Chief Judge, and Bishop and Arterburn, Judges.

Pirtle, Chief Judge.

## I. INTRODUCTION

Michelle M. Chmelka appeals from the decree entered by the Saunders County District Court dissolving her marriage to Kyle L. Chmelka. Michelle claims the district court abused its discretion in awarding joint legal and physical custody as well as equal parenting time. She also disputes the district

court's finding that $312,725 of stored grain, seed, fertilizer, and chemicals were Kyle's premarital property. For the reasons that follow, we affirm.

## II. BACKGROUND

Michelle and Kyle married in December 2014. They have two minor children: a son born in 2015 and a daughter born in 2017. Neither child was of school age at the time of trial. Michelle graduated from high school in 2009 and later received an associate's degree in business in 2011. During the marriage, Michelle worked first at a clinic, then at her mother's gas station in David City, Nebraska. She also acted as the children's primary caretaker throughout the marriage. Kyle graduated from high school in 2005 and later received a degree in heating and air conditioning. During the marriage, Kyle was a self-employed farmer. At all times during the marriage, the parties lived rent free in a home owned by Kyle's parents.

Michelle and the children moved out of the marital home on May 28, 2018. She filed a complaint for dissolution of marriage on July 23. Kyle did not file an answer. After a contested hearing, the district court entered an order for temporary custody, ordering Michelle and Kyle to share legal and physical custody, each having 1 week of alternating parenting time. Michelle was granted primacy in choices regarding the children's medical and religious upbringing; Kyle was given primacy regarding education and activities. Testimony showed that the parties were able to amicably abide by this parenting arrangement for over a year prior to trial.

At trial, Michelle testified that since the separation, she was again working at the clinic for 38 hours a week at $17.75 per hour. She testified that she had weekends off and had flexibility to care for the children if they were ill or injured. Michelle lived within 2 miles of her parents, who were also available to care for the children.

Regarding custody, Michelle testified that she was seeking sole legal and physical custody of the children subject to a parenting plan where she and Kyle would alternate time

between her 9 days and Kyle's 5 days. She testified she was qualified to be sole legal and physical custodian, because she put the children's best interests first, had a flexible job, and had been the primary caretaker of the children throughout the marriage. Michelle testified that during the marriage, she would get the children ready in the morning, transport them to and from daycare, bathe them, cook meals, and arrange medical appointments and social activities.

Michelle testified that there had been situations when "the kids [were] in Kyle's care that [she had] questioned their safety" and where he had not placed the best interests of the children at the forefront. She testified that Kyle abused alcohol more than once in her presence during the marriage and regularly "peed the bed" while intoxicated. However, she stated that as long as Kyle remained sober, she was not concerned for the children's safety. She testified that since the separation, Kyle called her a liar on the phone and in person, sometimes in the presence of their children. She also recounted an occasion in September 2019 when Kyle called her a "whore" in the presence of their daughter. However, she testified that all derogatory text messages and threats had since stopped.

Michelle testified that during the separation, there was a time when their son was sick during Kyle's parenting time. She testified that when she called to check on their son, Kyle told her that "he gave [their son] a whole bottle of Tylenol, that he was drugged up, that he would be just fine." When Michelle expressed concerns, Kyle claimed he had been joking. After she got off the phone, Michelle called the sheriff's department to conduct a welfare check. However, the sheriff was unable to make contact with Kyle either in person or via phone. On cross-examination, she admitted that she had no other evidence that Kyle had failed to give either of their children appropriate medical attention.

Michelle also testified that Kyle had been physically abusive to her on more than one occasion. She testified that in the spring of 2016, she was sleeping in their bedroom with their son when Kyle came home intoxicated. Michelle attempted

to stop Kyle from entering the room, and he "put [her] up against the wall" by pressing his forearm into her throat. Michelle then asked him to go downstairs, and Kyle went to sleep on the couch.

Michelle testified about a second event that occurred a few weeks before she moved out of the home. Around midnight, while she was sleeping in the bedroom with the children, Kyle came in the bedroom after climbing through an upstairs window. Michelle testified that she had blocked the stairs before going to bed to keep Kyle off of the second floor. She testified Kyle was lying down in their bed and was "being loud, so he had woken up [their son]," who was on the bed beside her. She testified Kyle "was trying to roll over towards [her], telling [her] she was going to get screwed." When Kyle would not leave her and their son alone, Michelle took him to sleep in a different room, but left their daughter sleeping in a crib next to the bed. Kyle did not follow her out of the room.

Michelle began to testify about text messages she received from Kyle acknowledging another incident of physical abuse. However, the court sustained Kyle's objection based on the form of the question, noting that the question "wasn't consistent with the testimony only because she testified to two incidents, and I don't know what you're referring to." Michelle did not testify about any other incidents of physical abuse.

Michelle testified that she was amenable to a provision that prohibited both her and Kyle from consuming alcohol before or during their parenting time. She testified that Kyle's abstaining from alcohol during his parenting time would allay concerns she had regarding the safety of the children. She agreed that she would be able to communicate with Kyle regarding their children's needs.

On cross-examination, Michelle admitted that during the separation, she had sometimes denied Kyle parenting time with the children. She admitted that in spite of the temporary order granting Kyle final say in all educational matters, she had taken their son to be evaluated for developmental issues without consulting Kyle. Michelle agreed that she had become

intoxicated on more than one occasion during the marriage and that she had driven with her children in the car after drinking. She admitted that she had raised her voice when speaking to Kyle while the children were present.

In regard to the marital estate, Michelle admitted that she had been aware Kyle had premarital property, but did not know the extent of it. She stated she "was not involved in the farming portion" of the marriage. She admitted she had no evidence to contradict Kyle's assertions regarding farm supplies and equipment he owned or had an interest in prior to the marriage.

Kyle testified that he began farming with his father in 2011. He testified that although he and his father help out with each other's fields, all of the money earned from Kyle's fields belongs solely to him. Although it varies by season, Kyle's work schedule is flexible. During the marriage, he stated that he was able to spend less time with the children than Michelle because of his role as a self-employed farmer. However, he testified that he was able to, and occasionally did, take the children to daycare, bathe them, and feed them when his schedule allowed. He has a large extended family that lives in the area, and at the time of trial, he saw his parents and sister at least weekly.

Kyle testified that he has a close relationship with his children. During Kyle's parenting time, he and the children play outside, sled in the wintertime, read books, watch television, and attend family gatherings. Kyle maintains a routine with the children, bathes them, puts them to bed, feeds them, and transports them to and from daycare.

Kyle testified regarding an incident when Michelle unilaterally removed the children from the daycare provider they had been using since birth without telling Kyle. He requested that the parties continue to share joint legal and physical custody under the same conditions as the temporary custody order.

Regarding the marital estate, Kyle testified that he worked solely as a farmer during the entire marriage. He testified that prior to the marriage, he had stored certain amounts of grain, seed, fertilizer, and other chemicals. He presented

documentation that showed the amounts and values of the stored farming assets, which included checks he had written, documents from his bank, and his tax returns. The evidence showed that Kyle owned $242,362 of grain, $40,000 of seed, $19,863 of fertilizer, and $10,500 of chemicals prior to the marriage, for a total of $312,725.

On cross-examination, Kyle admitted that he had called himself a "piece of shit father" to Michelle at some point after the separation in an attempt to win Michelle back. He also admitted that he had confessed to Michelle that he had a drinking problem. He admitted that he could not trace his premarital assets to any property that existed at the time of trial.

Kyle called the children's former daycare provider to testify. She testified that prior to becoming a licensed in-home daycare provider, she had been employed by Child Protective Services for 10 years. She was familiar with child abuse, child neglect, juvenile offenders, and behavioral difficulties in children. She testified she had been acquainted with Michelle and Kyle since their son started daycare at 6 weeks old. She testified that Kyle's parenting was always "[a]ppropriate" and that he "was very open in conversations with [her] about what the kids needed or how their day was."

Kyle's aunt, brother-in-law, and grandmother testified at trial. They testified that Kyle was affectionate and caring with the children and that they had never seen anything concerning in his interactions with them. They also all testified generally that Michelle frequently drank alcohol to the point of intoxication and that they had witnessed arguments between Michelle and Kyle during the marriage.

The district court entered an order dissolving the marriage. In its second amended decree of dissolution, the court found that both Michelle and Kyle were fit and proper parents and that awarding joint legal and physical custody was in the best interests of the children. Specifically, the decree found that the evidence failed to establish that the children were ever mistreated or neglected by Kyle during the course of the marriage or subsequently. Parenting time was split into an alternating

week-on-week-off schedule. Michelle was granted primacy in deciding matters related to religion and medical care; Kyle was granted primacy in matters related to education and activities. Neither the second amended decree of dissolution nor the court's oral comments from the bench at trial referenced Neb. Rev. Stat. § 43-2932 (Reissue 2016) or made findings related to that section.

Regarding distribution of property, the district court found that Kyle had met his burden of proof regarding the amount and value of stored grain and farm inputs he had owned at the time of the marriage, and it ordered an amount of $312,725 to be set off to him. This appeal followed.

## III. ASSIGNMENTS OF ERROR

Michelle asserts, restated, that the district court abused its discretion in (1) failing to find this is a case involving domestic abuse as defined in Nebraska's Parenting Act, (2) awarding joint legal and physical custody, (3) awarding equal parenting time, and (4) finding Kyle should receive a $312,725 set off for farming assets he held prior to the marriage.

## IV. STANDARD OF REVIEW

[1-3] In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Dooling v. Dooling*, 303 Neb. 494, 930 N.W.2d 481 (2019). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Id.* In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue. *Id.* However, when the evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Id.* A judicial abuse of discretion exists if the reasons or rulings of a trial judge are

clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

## V. ANALYSIS

### 1. Custody and Parenting Time

#### (a) Evidence of Domestic Abuse

Michelle first argues that the district court erred when it found that she did not prove by a preponderance of the evidence that Kyle had committed domestic abuse and therefore did not make specific written findings as required by the Parenting Act. She argues that the evidence at trial showed "a pattern of abusive, violent behavior by Kyle toward Michelle after Kyle becomes intoxicated." Brief for appellant at 16.

Here, the district court did not impose any limitations on Kyle's custody of the parties' children, let alone make special written findings that such limitations would protect the children or Michelle from harm. Neither did the district court explicitly find that § 43-2932 did not apply in this case, either in its decree or at trial. However, the Nebraska Supreme Court has, in the past, presumed that where a district court does not impose limitations or make special findings, it fails to do so because it found that § 43-2932 did not apply. See *Randy S. v. Nicolette G.*, 302 Neb. 465, 924 N.W.2d 48 (2019) (presuming in bench trial that judge was familiar with and applied proper rules of law unless it clearly appears otherwise). We thus similarly presume that the court found Michelle did not meet her burden of proof under § 43-2932. And, for reasons explained below, we find no basis upon which to reverse the district court's determination that neither limitations nor special findings were required in this case.

Nebraska's Parenting Act establishes certain requirements which must be met where a parent is found by a preponderance of the evidence to have committed child abuse or neglect, child abandonment, or domestic intimate partner abuse, or to have interfered with the other parent's access to the

child. Section 43-2932(3) sets forth these additional require-
ments, stating:

> If a parent is found to have engaged in any activity speci-
> fied in subsection (1) of this section, the court shall not
> order legal or physical custody to be given to that parent
> without making special written findings that the child and
> other parent can be adequately protected from harm by
> such limits as it may impose under such subsection. The
> parent found to have engaged in the behavior specified in
> subsection (1) of this section has the burden of proving
> that legal or physical custody, parenting time, visitation,
> or other access to that parent will not endanger the child
> or the other parent.

In this case, evidence that Kyle abused Michelle is limited
to two incidents. First, Michelle testified that in the spring
of 2016, Kyle pushed Michelle against the wall with his
forearm when she tried to physically block his entry to their
bedroom. Michelle then asked Kyle to sleep downstairs, and
he complied.

The second incident occurred in May 2018, shortly before
the parties separated. After Michelle blocked off the stairs to
keep Kyle off of the second floor, Kyle climbed through an
upstairs window and went to their bedroom. Kyle got into
the bed where Michelle and their son were sleeping and said
to Michelle that she was "going to get screwed." Kyle then
attempted to roll over toward Michelle. Michelle left the bed-
room with their son, but left their daughter sleeping in her crib
in the same room as Kyle.

[4] Michelle argues, but does not specifically assign, that the
district court erred in sustaining Kyle's objection to testimony
regarding a third incident of alleged abuse. To be considered
by an appellate court, an alleged error must be both specifically
assigned and specifically argued in the brief of the party assert-
ing the error. *Diamond v. State*, 302 Neb. 892, 926 N.W.2d 71
(2019). Therefore, we do not consider this argument.

[5] In considering the record, we do not find testimony that
there existed a pattern or history of similar abusive actions

by Kyle. Although Michelle references "years of misdeeds" by Kyle, she did not present any evidence of such at trial. Brief for appellant at 18. It is correct that Kyle did not refute Michelle's testimony, but Michelle incorrectly asserts that merely presenting uncontroverted evidence of abuse automatically meets her burden of proof. The rule is well established in this jurisdiction that evidence not directly contradicted is not necessarily binding on the triers of fact, and may be given no weight where it is inherently improbable, unreasonable, self-contradictory, or inconsistent with facts or circumstances in evidence. *Burgardt v. Burgardt*, 304 Neb. 356, 934 N.W.2d 488 (2019).

An appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Blank v. Blank*, 303 Neb. 602, 930 N.W.2d 523 (2019). Here, we give weight to the fact that the district court heard and observed both Michelle and Kyle while at trial and did not find sufficient evidence of domestic abuse.

On this record, we cannot say that the district court erred in not applying § 43-2932. As in *Randy S. v. Nicolette G., supra*, we believe that the district court's decision not to apply § 43-2932 is most sensibly understood as reflecting that the district court did not accept Michelle's trial testimony to prove by a preponderance of the evidence that Kyle engaged in a pattern of domestic abuse against Michelle. Therefore, the court was not required to make written findings as outlined in § 43-2932(3). This argument fails.

### (b) Lack of Notice

Michelle next argues that the district court abused its discretion in awarding joint legal and physical custody because Kyle "never filed an Answer or otherwise pled placing custody at issue." Brief for appellant at 20. However, she does not argue this claim beyond a single sentence.

We construe Michelle's claim as an argument that she was not afforded due process, because she lacked notice that the

court might award joint legal and physical custody. In *Blank v. Blank, supra*, a wife argued that the trial court had erred in awarding joint custody, because neither side requested joint custody and the court did not provide notice of its consideration. In *Blank*, the court found no error and determined that both parties had received notice prior to trial that joint custody was at issue through the wife's initial pleadings, proposed parenting plans, and hearings for temporary custody.

Here, Michelle's initial complaint clearly placed the children's custody at issue by requesting sole legal and physical custody. Prior to trial, Kyle appeared at the hearing for temporary custody and testified regarding his desire for custody and parenting time. At trial, Kyle presented his own proposed parenting plan requesting joint legal and physical custody and equal parenting time. Considering these factors, it is clear that Michelle received adequate notice that custody of the children was at issue and that Kyle desired both joint legal and physical custody and parenting time. This argument fails.

### (c) Best Interests

Michelle further argues that even if the court did not abuse its discretion in failing to find this case was one governed by § 43-2932(3), the court erred in finding joint legal and physical custody was in the children's best interests.

[6] Joint physical custody is neither favored nor disfavored under Nebraska law, and, in fact, no custody or parenting time arrangement is either favored or disfavored as a matter of law. *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019). When determining the best interests of the child in deciding custody, a court must consider, at a minimum, (1) the relationship of the minor child to each parent prior to the commencement of the action; (2) the desires and wishes of a sufficiently mature child, if based on sound reasoning; (3) the general health, welfare, and social behavior of the child; (4) credible evidence of abuse inflicted on any family or household member; and (5) credible evidence of child abuse or neglect or domestic intimate partner abuse. § 43-2923(6).

[7] In addition to these statutory "best interests" factors, a court making a child custody determination may consider matters such as the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy the educational needs of the child. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015).

The Parenting Act also provides that the best interests of a child require a parenting plan that provides for a child's safety, emotional growth, health, stability, physical care, and regular school attendance and which promotes a child's continued contact with his or her families and parents who have shown the ability to act in the child's best interests. § 43-2923(1) and (3).

In support of her position that joint legal and physical custody was not in the children's best interests, Michelle points to the fact that Kyle once described himself as a "piece of shit father," that he told the children Michelle was a liar, and that Michelle was the primary caretaker throughout the marriage. Brief for appellant at 20. She also references Kyle's history with alcohol and the incident when he told her on the phone that he had given their son an entire bottle of Tylenol.

However, Michelle also testified that Kyle had stopped making derogatory statements about her in the presence of their children. She admitted that aside from the incident with the Tylenol, she had no concerns about Kyle's ability to care for the children's medical needs. There was no evidence presented that Kyle was ever violent or harmful to the children or to Michelle when he was sober or that Kyle was ever intoxicated during his parenting time. She described Kyle as a good father. Furthermore, at the time of trial, the parties had been successfully sharing joint legal and physical custody and

equal parenting time for over a year. Both Michelle and Kyle testified that their children were doing well and were happy under the current arrangement.

Upon our de novo review of the record, we cannot say that the district court abused its discretion in awarding the parties joint legal and physical custody of their children. This argument fails.

## 2. DIVISION OF MARITAL ESTATE

Michelle was awarded a property equalization judgment of $59,704.34. However, she argues that the district court abused its discretion in setting off $312,725 of stored grain and farm inputs (seed, fertilizer, and chemicals) to Kyle. Specifically, she alleges that Kyle did not meet his burden of proof in tracing the premarital property to any property that existed at the time of the divorce decree.

[8-12] In a divorce action, the purpose of a property division is to distribute the marital assets equitably between the parties. *Doerr v. Doerr*, 306 Neb. 350, 945 N.W.2d 137 (2020). The first step is to classify the parties' property as marital or nonmarital. *Id.* The marital estate does not include property that a spouse acquired before the marriage, or by gift or inheritance. *Id.* Setting aside nonmarital property is simple if the spouse possesses the original asset, but can be problematic if the original asset no longer exists. *Id.* Separate property becomes marital property by commingling if it is inextricably mixed with marital property or with the separate property of the other spouse. *Id.* If the separate property remains segregated or is traceable into its product, commingling does not occur. *Id.* The burden of proof rests with the party claiming that property is nonmarital. *Id.*

A nonmarital interest in property may be established by credible testimony. *Burgardt v. Burgardt*, 304 Neb. 356, 934 N.W.2d 488 (2019). The Supreme Court has recognized that a spouse's own testimony can establish a """tracing link,""" i.e., tracking an asset to a nonmarital source. *Id.* at 364, 934

N.W.2d at 495 (quoting *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016)).

The Supreme Court has addressed the issue of tracing stored crops and farm inputs multiple times. In *Brozek v. Brozek, supra*, the Supreme Court determined the husband was not entitled to a set off because he was unable to give more than a rough estimate of the number of bushels of grain he had harvested and stored at the time of marriage. Further, after 20 years of marriage, the husband could not "identify the different permutations that his premarital property underwent during the marriage." *Id*. at 699, 874 N.W.2d at 31. Therefore, the Supreme Court concluded the premarital crops were inextricably mixed with the marital estate.

The Supreme Court refined its holding in *Brozek* in *Osantowski v. Osantowski*, 298 Neb. 339, 904 N.W.2d 251 (2017). There, the husband had grain stored at the time of the marriage, and at trial, he presented evidence establishing the value of that grain. Applying the principles stated in *Brozek*, the trial court determined he was not entitled to a set off of the value of the premarital grain. However, the Supreme Court disagreed, writing, "We recognize the law concerning tracing, but we also recognize the overarching principle in the division of marital property is equity, ultimately guided by fairness and reasonableness." *Osantowski v. Osantowski*, 298 Neb. at 357, 904 N.W.2d at 266.

The Supreme Court went on to distinguish *Osantowski* from *Brozek* in three respects. First, in *Brozek*, the husband could not definitively identify the value of his premarital assets, whereas in *Osantowski*, the value was established and was uncontroverted. Second, in *Brozek*, the estimated value of the premarital asset was less than 10 percent of the net marital estate, whereas in *Osantowski*, it was nearly 87 percent. Finally, in *Brozek*, the parties had been married for 20 years, whereas in *Osantowski*, the marriage lasted only 2½ years.

In applying the principles articulated in *Brozek* and *Osantowski*, we determine that the district court did not

abuse its discretion in granting Kyle a setoff for his stored grain and farm inputs. Kyle testified that at the time of the marriage, he had invested in seed, fertilizer, and chemicals that he intended to use the following year. He also had stored grain from the previous year's harvest. His testimony and supporting documentation also demonstrated the exact quantity of grain and supplies he owned, as well as the value of the assets at the time of the marriage. While Kyle could not perfectly trace the proceeds he derived from the stored grain, he established the exact value of the grain that he did have in storage as of the date of the marriage. At trial, Michelle offered no evidence to contradict Kyle's testimony or exhibits, although she admitted he owned farming assets at the time they married.

Michelle argues in her brief that the fact that she and Kyle have two minor children and that Michelle was regularly employed during the marriage weigh against a similar finding to that in *Osantowski*. She also points to medical expenses she paid for the children which the court "refused to equitabl[y] divide between the parties." Brief for appellant at 23. However, Michelle does not explain why those facts necessarily exclude consideration of Kyle's premarital investments as applied in this case. Further, Michelle does not explain, nor is it clear from the district court's table of assets and liabilities, just how the attribution of the premarital credit adversely affected Michelle. While the district court discussed the premarital credit, its calculations do not reflect that the credit was applied to Kyle's net marital estate; thus, Kyle was left owing Michelle $59,704.34 to equalize the marital estate. We can only surmise from the record that the district court determined it would be inequitable to Michelle if the court credited Kyle with the entire premarital investment, as this would have left Michelle potentially owing an equalization judgment to Kyle. Instead, it appears the court found it more equitable to simply exclude the current value of stored grain in its calculation of Kyle's assets, which the record reflects was $46,480. We find no abuse of discretion in the court's doing so.

## VI. CONCLUSION

Upon our de novo review, we conclude that the district court did not abuse its discretion in determining § 43-2932(3) did not apply in this case and that the court did not abuse its discretion in awarding joint legal and physical custody and equal parenting time. We also conclude there was no abuse of discretion by the district court in setting off to Kyle an amount representing stored grain, seed, fertilizer, and chemicals he owned prior to the marriage. The order of the district court is affirmed.

AFFIRMED.