IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

GLYNN V. FAUBLE

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

KELLY C. GLYNN, APPELLEE,

V.

JEFFREY C. FAUBLE, APPELLANT.

Filed February 27, 2024.    No. A-23-366.

Appeal from the District Court for Douglas County: J. MICHAEL COFFEY, Judge. Affirmed.

Donald A. Roberts, of Roberts Law, L.L.C., for appellant.

Kelly Glynn, pro se.

PIRTLE, Chief Judge, and MOORE and BISHOP, Judges.

MOORE, Judge.

## INTRODUCTION

Jeffrey C. Fauble appeals from the order of the district court for Douglas County, which modified the decree dissolving his marriage to Kelly C. Glynn. On appeal, Jeffrey asserts that the court erred in failing to give significant consideration to the testimony of one of the parties' children and in failing to modify custody. Finding no abuse of discretion, we affirm.

## STATEMENT OF FACTS

The parties have two minor children, Collin, born in 2009, and Chapman, born in 2015. The parties were divorced in in January 2019. Under the decree of dissolution, the parties were awarded joint legal and joint physical custody of the children, and the parenting plan provided for a "2/2/3" parenting time schedule. At some point in 2020, the parties agreed to a "7 on/7 off" parenting time schedule.

- 1 -

On October 13, 2020, Jeffrey filed a complaint for modification, seeking sole legal and sole physical custody of the children. He alleged that a material change in circumstances had arisen since entry of the decree in that (1) Kelly had secured new employment which required significant travel and provided a higher income than her previous employment; (2) Kelly had ignored the obligations of the award of joint legal custody by taking action on many issues and not involving Jeffrey in decisions or advising him of actions she wanted to take in advance of taking those actions; (3) Kelly's conduct in front of and directly to the children, particularly Collin, showed her complete failure to properly parent or emotionally or physically support Collin; (4) Kelly's verbal statements and comments to the children about Jeffrey were not in the children's best interests and were emotionally harmful to them; and (5) Kelly failed to communicate reasonably with Jeffrey to the extent that joint legal custody was no longer appropriate.

The modification trial was held on March 1, 2023. The district court heard testimony from the parties, and it received exhibits including depositions of both children and multiple text message exchanges between the parties.

Jeffrey was in school full-time and was not employed at the time of trial. He earned his bachelor's degree in psychology at the end of 2019. He then entered a graduate school and was in his "third-year practicum" of a program in psychology to be able "to work in the schools as a school psychologist." He had already received a master's degree at the halfway point in the program and anticipated receiving his "EDS, which is an education specialist, to practice in the schools" in 2024. He anticipated being able to work full-time with a starting salary of around $40,000 per year upon completion of the program. At the time of trial, he was spending between 18 and 24 hours a week "in the schools practicing." His schedule varied daily. He also had some classes in the evenings.

Jeffrey testified that the parties followed the parenting time schedule set forth in the decree until about September 2020 when Kelly requested a change based on the travel nurse position she had accepted during the pandemic. The parties discussed the issue and agreed to the alternating week-on-week-off schedule that they were still following at the time of trial. Jeffrey has remarried since the parties' divorce, and his current wife has two children about the same age as the parties' children. Jeffrey described the normal routine in the home during his parenting time.

Jeffrey testified about issues relating to the parties' exercise of joint legal custody and the parties' communication with one another. Jeffrey testified that he understood joint legal custody to mean "making decisions together before you decide to do something . . . to make sure it's in the best interest[s] of the kids. Not making decisions without the other one being involved in it beforehand." Jeffrey testified that the parties' in-person communication usually "ends up in an argument," so he prefers email and text messaging as provided for in the decree.

As to Jeffrey's specific concerns, he testified that he had "heard of two different therapies" that the children were involved in, that Kelly did not discuss the children being "in therapy" with him ahead of time, and that despite requesting the information from Kelly, he had not been informed of full names or office locations for any therapists the children had seen or were seeing. Jeffrey also testified that Kelly had failed to appropriately inform him about the children's activities, such as swimming lessons; coordinate with him in advance as to Chapman's registration time for kindergarten round-up; cooperate with Collin's participation in Cub Scouts after the parties agreed to it; provide him with information about whether the children had been sick or

received medication during her parenting time; or inform him in advance about other medical issues. He indicated that on at least one occasion, Kelly had communicated through one of the parties' children about that child's illness, instead of with him directly. Jeffrey testified that Kelly was not "very often" scheduling dental appointments for the children, or was canceling appointments "at the last minute," and he expressed frustration that he had not been provided with insurance cards so that he could take the children. Jeffrey testified to his belief that it was not possible to continue joint legal custody based on Kelly's conduct.

Jeffrey testified about the provision of the parenting plan that allowed for telephone calls every day when the children were in the other parent's care. According to Jeffrey, he attempted to contact the children as allowed under this provision, but he was "[r]arely" able to get through. He also noted that the children like to speak to his wife and his wife's children during these calls, but that Kelly has interfered with the children doing this, sometimes speaking on the phone to Jeffrey and telling him that he was the only one who should be speaking to the children during the calls. Jeffrey also testified that Kelly has told the parties' children that Jeffrey's wife is not their "mom" and "don't call her that," that she has blocked the wife's number on Collin's phone, and that he has continually "received information from the boys concerning how [Kelly] speaks about [him] to the boys."

Another topic addressed in the parties' testimony was Kelly's conduct with respect to Collin, and in particular, an incident in September 2020 that allegedly involved a physical altercation between Kelly and the children. Kelly testified that Jeffrey filed a protection order petition for himself and the children based on allegations about the incident. Kelly attended and testified at the show cause hearing held in the protection order proceedings; she indicated that no one else testified. During the modification hearing in this case, Jeffrey's attorney agreed that there was a show cause hearing and that the protection order petition was dismissed. Jeffrey was not present during the September 2020 incident, but he testified that he believed what the children had told him about the incident. Although the protection order petition and order dismissing it were marked as exhibits in the modification proceedings, they were not offered into evidence.

Kelly has not remarried since the parties' divorce, but she has had another child, who was 16 months old at the time of the modification trial. The child's father resided with her for a period during her pregnancy (until May 2022). She denied having "screaming arguments" with the child's father in front of the parties' children while he was living in her home.

Kelly is a registered nurse and has maintained her job in the emergency room at a Nebraska hospital since entry of the decree. In the fall of 2020, she took a "13-week contract" for a travel nurse position "to help out in California" during the pandemic. She then took a flight nurse job at another Nebraska hospital, but when that employer wanted her to work nights instead of days, she took a Monday through Friday job at "Think," while maintaining her "casual status" at the first Nebraska hospital. She testified that the job at Think was "not the type of job for [her]," so she returned to full-time employment at the emergency room of the first hospital. At the time of the trial, she was working three 12-hour shifts a week starting at either 7 a.m. or 8 a.m.

Kelly testified about the parties' communications with one another and their exercise of joint legal custody. Kelly agreed that it was important for both parents to know about the children's medical appointments. She also indicated that it is "very hard" to schedule medical and dental appointments for the children at a time that works for both of the parties. Kelly also agreed that it

was important to let the other parent know if a child had been sick and continued to be sick when returning to the other parent. She testified that she had notified Jeffrey on occasions when the children needed medication during his parenting time. Kelly agreed that she had the children see a therapist, even though Jeffrey was "not on board," because it was in "the best interest of our boys because there were some things going on that needed to be talked about." Kelly testified that the children had not attended any therapy since the fall of 2021. Kelly testified that she has not scheduled events during Jeffrey's parenting time without further conversation with Jeffrey. Kelly's position was that there were "some growing pains" when the parties were first awarded joint legal custody, but that it was "getting better." She testified that she wanted to continue having joint legal and joint physical custody with Jeffrey because it was in the children's best interests, although she preferred to return to a "2/2/3" parenting time arrangement.

Kelly testified about the September 2020 incident, the protection order filed by Jeffrey, and her conduct toward the children in general. According to Kelly, the allegations raised with respect to the September 2020 incident were not true, and she denied hitting Collin, swearing at, or harming the children during the incident. She agreed that her description of what took place during the incident differed from the children's. According to Kelly, she was interviewed by "CPS" regarding the allegations, and the outcome of the investigation was "[u]nfounded." She testified that a police detective interviewed her about the allegations but that she never heard anything further from the police. Kelly also denied using certain profanity "around the house on a regular basis," having slapped the children on multiple occasions, putting her hands over their mouths and noses, or calling them certain names since entry of the decree.

Kelly was questioned about parenting-time telephone calls and issues relating to how she speaks about Jeffrey, Jeffrey's wife, and the wife's children. When asked whether the wife and the wife's children should be involved in the parenting time phone calls, Kelly testified that the calls were intended to foster the relationship between the parties' children and Jeffrey. Kelly denied getting "mad" if the children referred to Jeffrey's wife as "[m]om" when they were in her house. Kelly indicated that she did not care how the children referred to the wife while in Jeffrey's house but that in Kelly's house, "We can talk about her as [wife's given name]." Kelly denied telling the children that a "step-mom is not a real mom" and that they should not "call their step-siblings brother and sister." She denied ever speaking badly about Jeffrey or his wife in front of the parties' children since entry of the decree.

We have reviewed the children's depositions in their entirety and briefly summarize their testimony. Collin was in the eighth grade at the time of his testimony. He testified about the differences in daily schedules and routines at each parent's house. He also testified about Kelly's use of swear words; her speaking badly about Jeffrey and Jeffrey's wife; and a physical altercation between Kelly and the children, as well as other instances of physical aggression by Kelly. Collin expressed a preference to live with and spend more time with Jeffrey than with Kelly. Chapman, who was 7 years old at the time of his deposition, expressed a preference to spend more time with Jeffrey than Kelly, although during his deposition he also endorsed several parenting time schedules involving more equal amounts of time with each parent with switches occurring more often than once a week.

On April 27, 2023, the district court entered an order of modification. The court found a material change in circumstances since entry of the decree in that the parties had modified the

- 4 -

parenting schedule by agreement to 7 days on and 7 days off with parenting time commencing on Friday after school and ending the following Friday after school (or commencing on Friday at 9 a.m. and ending at 9 a.m. the following Friday when the children were not in school). The court found that the modified schedule agreed to by the parties was in the children's best interests and should continue until further order of the court. The court also modified the decree to provide that the party maintaining health insurance for the children should provide insurance cards to the other party, modified the parenting plan to allow each party to make telephone calls on Sunday and Wednesday evening when the children were at the other parent's home as long as such contact occurred before 7:30 p.m., and modified the parenting plan to give Kelly final decision making regarding medical and dental decisions affecting the children when after reasonable discussion the parties could not agree. Finally, the court stated that the terms and conditions of the decree and parenting plan not modified in its April 2023 order remained in full force and effect.

Jeffrey subsequently perfected the present appeal to this court.

## ASSIGNMENTS OF ERROR

Jeffrey asserts that the district court abused its discretion in (1) failing to give significant consideration to Collin's testimony and (2) failing to award Jeffrey sole legal and physical custody of the children.

## STANDARD OF REVIEW

Modification of a dissolution decree is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and will be affirmed absent an abuse of discretion by the trial court. *Parish v. Parish*, 314 Neb. 370, 991 N.W.2d 1 (2023). A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.* In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Winkler v. Winkler*, 31 Neb. App. 162, 978 N.W.2d 346 (2022).

## ANALYSIS

*Consideration of Collin's Testimony.*

Jeffrey asserts that the district court abused its discretion in failing to give significant consideration to Collin's testimony. He notes certain comments made by the court when the children's depositions were being offered into evidence during the modification trial, and he argues that the court's comments, made before reviewing the children's testimony to see whether they expressed intelligent preferences, show that the court had no intention of giving significant consideration to those preferences. He also argues that the case law clearly requires the court to give Collin's preference significant consideration.

As discussed further below, custody of a minor child will not ordinarily be modified absent a material change in circumstances, which shows either that the custodial parent is unfit or that the best interests of the child require such action. *Jaeger v. Jaeger*, 307 Neb. 910, 951 N.W.2d 367 (2020). Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) sets forth a nonexhaustive list of factors to

be considered in determining the best interests of a child in regard to custody, including "[t]he desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning."

The wishes of a child are not controlling in determinations of child custody. *Jaeger v. Jaeger, supra*. If a child is of sufficient age and has expressed an intelligent preference regarding child custody, the child's preference is entitled to consideration, alongside other factors. *Id.* The amount of consideration given to a child's stated preference regarding child custody will depend on the child's age and ability to give reasons for his or her preference. *Id.* In cases where the child's preference was given significant consideration, the child was typically over 10 years old. See *id.* Where a trial court's order modifying child custody demonstrates that the child's age and reasoning have been duly considered alongside the child's stated preference, an appellate court will generally defer to the trial court's credibility determinations in the assessment of facts. *Id.*

At trial, when Jeffrey's attorney offered the children's depositions as exhibits, Kelly's attorney objected, arguing essentially that some of the topics addressed in the exhibits, including "Collin's preference," related to issues not directly raised in the complaint to modify. Kelly's attorney argued that the parties were in court to determine the continued appropriateness of joint legal and joint physical custody, "based on this incident of September 2020," and stated that he otherwise had "no issue with the depositions." A discussion then ensued between the parties' attorneys and the district court about the scope of the issues raised in the complaint to modify and how "Collin's preference" related to those issues. After receiving clarification that the complaint included Jeffrey's request for sole physical custody, the court stated, "That's what I meant. Not that I'm going to put a lot of stock in what the kids say in that regard, but why wouldn't it be relevant if, in fact, one of the things requested is that [Jeffrey] have sole physical custody?" After further discussion, the court overruled Kelly's objection and received the depositions into evidence, stating, "I'm not going to put a lot of stock in what the boys said, where they want to go. Okay? That's not going to be pivotal of the decision I make. If I change my mind, I'll make sure that's in the order."

We do not interpret the district court's comments at trial to indicate that it was not going to consider the evidence as to Collin's preferences in ruling on Jeffrey's complaint to modify custody, and we see nothing in the court's modification order to indicate that it did not give appropriate consideration to the evidence in that regard. As the case law indicates, a child's stated preference regarding child custody is just one of the factors for a court to consider in determining whether to modify custody, and, we have considered the children's ages, preference, and reasoning in our de novo review. This assignment of error fails.

*Modification of Custody.*

Jeffrey asserts that the district court abused its discretion in failing to award him sole legal and physical custody of the children. In his arguments, he focuses on evidence reflecting differences in the parties' parenting styles and the conflicting evidence regarding Kelly's actions toward the children, and he argues that all of the evidence and the court's failure to give significant consideration to the children's testimony, especially Collin's, establishes its abuse of discretion.

As we noted above, custody will not ordinarily be modified absent a material change in circumstances showing either that the custodial parent is unfit or that the best interests of the child

require such action. See *Jaeger v. Jaeger*, 307 Neb. 910, 951 N.W.2d 367 (2020). Modifying a custody or parenting time order requires two steps of proof. *Lindblad v. Lindblad*, 309 Neb. 776, 962 N.W.2d 545 (2021). First, the party seeking modification must show by a preponderance of the evidence a material change in circumstances that has occurred after the entry of the previous custody order and that affects the best interests of the child. *Id.* Second, the party seeking modification must prove that changing the child's custody or parenting time is in the child's best interests. *Id.*

Generally speaking, a material change in circumstances is the occurrence of something which, had it been known to the dissolution court at the time of the initial decree or prior modification, would have persuaded the court to decree differently. *Id.* Proof of a material change in circumstances is the threshold inquiry in a proceeding on a complaint to modify, because issues determined in the prior custody order are deemed preclusive in the absence of proof of new facts and circumstances. *Id.* The party seeking modification of a dissolution decree has the burden to produce sufficient proof that a material change of circumstances has occurred that warrants a modification. *Keiser v. Keiser*, 310 Neb. 345, 965 N.W.2d 786 (2021).

Under the Parenting Act, the requirements for a child's best interests include "[a] parenting arrangement and parenting plan or other court-ordered arrangement which provides for a child's safety, emotional growth, health, stability, and physical care and regular and continuous school attendance and progress for school-age children." § 43-2923(1). Additionally, § 43-2923(6) sets forth a non-exhaustive list of factors to be considered in determining the best interests of a child in regard to custody, including:

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member. For purposes of this subdivision, abuse and family or household member shall have the meanings prescribed in section 42-903; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse. For purposes of this subdivision, the definitions in section 43-2922 shall be used.

And, as we noted previously, the wishes of a child are not controlling in determinations of child custody and the amount of consideration given to such preferences depends on the child's age (usually over 10 years old) and ability to give reasons for that preference. See *Jaeger v. Jaeger*, 307 Neb. 910, 951 N.W.2d 367 (2020).

In addition to the "best interests" factors listed in § 43-2923, a court making a child custody determination may consider matters such as the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy

the educational needs of the child. *Chmelka v. Chmelka*, 29 Neb. App. 265, 953 N.W.2d 288 (2020).

In its modification order, the district court found a material change in circumstances warranting a modification of the parenting time schedule based upon the parties' agreed upon changes following the divorce, and it modified the decree accordingly. The court also made modifications with respect to the provision of health insurance cards to the other parent by the parent maintaining health insurance on the children, and it modified the telephone call provision of the parenting plan and gave Kelly final decision-making authority with respect medical and dental decisions affecting the children. The court stated that all terms of the decree and parenting plan not specifically modified, were to remain in full force and effect, implicitly finding that Jeffrey did not prove a material change in circumstances warranting a modification of custody.

In his complaint for modification, Jeffrey alleged material changes warranting a modification of the decree, including Kelly's "new employment" requiring significant travel, Kelly ignoring obligations of joint legal custody and not involving Jeffrey in decisions, her failure to communicate reasonably with Jeffrey, her conduct in front of and toward the children, and her statements to the children about Jeffrey.

At trial, there was evidence about Kelly's employment. She took a travel nurse position during the pandemic involving travel to California, but at the time of the modification trial Kelly had full-time employment in the emergency room at a Nebraska hospital, working three 12-hour shifts per week. The record does not establish a material change in circumstances with respect to Kelly's employment.

As to the parties' communications and exercise of joint custody, while the evidence shows that the parties do not communicate well, there was nothing in the record to show how or whether their ability to communicate had changed since entry of the decree. Jeffrey clearly has interpreted the award of joint legal custody as requiring a level of pre-decision communication not specified in the parenting plan. For example, the parenting plan provides that the parties "agree to discuss matters concerning the children, such as health and medical, school related problems and decisions, and any behavioral or disciplinary issues which could impact both households." The parenting plan provides that "[d]ecisions of the moment regarding day-to-day care of the children will be made by the parent with whom the children are residing at the time." The parenting plan requires the parties to "exercise mutual authority and responsibility of making fundamental decisions" regarding the children's welfare and "mutually participate in the responsibility of providing the parenting functions necessary for raising their children" and "consult with each other on medical concerns," but it does not require that each parent advise the other parent prior to making every decision as to the children's welfare. Jeffrey did not establish a material change in circumstances with respect to the parties' communications and exercise of joint legal custody warranting a modification of the decree to award him sole legal custody. The court did modify the parenting plan to give Kelly final decision making with regard to medical and dental decisions affecting the children. Jeffrey has not challenged this finding by the court.

With respect to the September 2020 incident, Kelly's general behavior toward the children, and the way she speaks about Jeffrey and Jeffrey's wife in front of the children, while these allegations are concerning, the evidence as to these issues was conflicting. Kelly's description of the September 2020 incident differed from that of Collin's and Jeffrey's, and we note Kelly's

testimony that Jeffrey's application for a protection order for himself and the children following this incident was dismissed after a show cause hearing. None of the pleadings, orders, or testimony in the protection order case were offered as evidence in the modification trial. In sum, Kelly's evidence with respect to her behaviors conflicted with the evidence presented by Jeffrey, and the district court clearly credited Kelly's version over Jeffrey's. We give weight to the court's determination in that regard. See *Winkler v. Winkler*, 31 Neb. App. 162, 978 N.W.2d 346 (2022).

Finally, as to the preferences expressed by the children in their depositions, we note that Chapman, who was only 7 years old at the time, expressed conflicting preferences, stating a preference both for spending more time with Jeffrey and less with Kelly and also a preference for several equal parenting time schedules with more frequent parenting time changes than the schedule in place at the time of trial. Collin, who was in the eighth grade, generally expressed a preference for spending more time with Jeffrey than with Kelly. He expressed frustration with Kelly's work schedule and certain behavior by her. Collin testified that neither he nor Jeffrey felt that Kelly's home was a "proper environment" for him. We have considered the children's preferences, as well as the other relevant factors, in our de novo review of the district court's decision not to modify legal and physical custody.

Upon our de novo review, we conclude that Jeffrey did not meet his burden of proving a material change of circumstances warranting a modification of custody. Accordingly, the district court did not abuse its discretion declining to modify legal and physical custody.

CONCLUSION

The district court gave appropriate consideration to Collin's testimony. The court did not abuse its discretion in declining to modify the decree to award Jeffrey sole legal and sole physical custody of the parties' children. Accordingly, we affirm.

AFFIRMED.